IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Criminal Action No. 18-cr-00525-CMA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ALVARO PABLO VELARDE,

    Defendant.

---

## ORDER DENYING DEFENDANT'S MOTION FOR A NEW TRIAL

---

This matter is before the Court on Defendant's Motion for a New Trial, wherein he argues that a new trial should be granted pursuant to Fed. R. Crim. P. 33 on the basis of new evidence. (Doc. # 109.) For the reasons described herein, Defendant's Motion is denied.

### I.     BACKGROUND

Defendant Alvaro Pablo Velarde ("Mr. Velarde") was indicted by a grandy jury on two counts of aggravated sexual assault in violation of 18 U.S.C. §§ 2241(a)(1) and (2) and one count of abusive sexual contact in violation of 18 U.S.C. § 2244(a)(1). (Doc. # 27.) Mr. Velarde was tried before a jury beginning on April 29, 2019. (Doc. # 82.) Sixteen witnesses testified at trial, including both the Victim ("Victim") and Mr. Velarde. (Doc. ## 82–85.) Mr. Velarde was convicted of all three counts of the indictment on the fourth day of trial. (Doc. ## 85, 88.)

On September 3, 2019, Mr. Velarde filed the instant Motion for a New Trial pursuant to Fed. R. Civ. P. 33 on the basis of newly discovered evidence. (Doc. # 109.) On September 12, 2019, Mr. Velarde filed a Supplement to Defendant's Motion for a New Trial. (Doc. # 118.) In his Motion and Supplement, Mr. Velarde argues that Carlos Hinojosa's "recantation" of information he provided in pretrial interviews, Victim's post-trauma medical condition, and Cadet Lillian Landis's post-trial statements all constitute new evidence that warrant a new trial. The government opposes Defendant's Motion. (Doc. # 118.)

**A.    CARLOS HINOJOSA'S STATEMENTS**

Mr. Velarde states that he did not call Carlos Hinojosa ("Mr. Hinojosa"), his roommate at the time of the alleged sexual assault, to testify at trial because he believed Mr. Hinojosa would present damaging testimony against him. (Doc. # 109 at 2.) Specifically, Mr. Velarde believed Mr. Hinojosa would testify that Mr. Velarde told him that Victim told Mr. Velarde "no" at least three separate times during the alleged assault because Mr. Hinojosa "said as much in two interviews with defense counsel and in a sworn, written statement to the Air Force Office of Special Investigation" ("OSI"). (*Id*.) Additionally, a Denver 7 News article at the time stated: "The defendant's roommate told investigators that Velarde admitted that he continued to have sex with her even after she asked him to stop, according to court records." (*Id*.) Mr. Velarde summarized that, before trial, "Hinojosa maintained that he thought that Defendant was guilty, that Victim was raped by Defendant, that Victim was completely honest, and [that he] did not have anything to say to Defendant ever again." (*Id*. at 5.)

After Mr. Velarde was convicted, on August 25, 2019, Mr. Hinojosa made a video call to Mr. Velarde in jail. During this call, Mr. Hinojosa stated that Mr. Velarde did not tell him that Victim said "no" during the alleged assault. Mr. Hinojosa stated: "I never said that she said 'No,' I said that she said 'It's not correct,' but that for me doesn't mean nothing, a girl can say that but that, is not 'No' and sorry bro but the girl is always gonna win . . . ." (*Id*. at 10) (quoting Doc. # 109-1). Mr. Hinojosa told Mr. Velarde, "I miss you, I wanna cry" and "I was so confused, sometimes I cry because all of this is fucked up." (*Id*. at 9) (quoting Doc. # 109-1).

During this video call and during a subsequent interview with defense counsel, Mr. Hinojosa made several statements for the first time about, *inter alia*, Victim's motivations to lie about the encounter between her and Mr. Velarde, Victim's behavior after the trial, and Mr. Hinojosa's belief that Mr. Velarde is innocent. *See* (*id*. at 9–12). Mr. Hinojosa also repeated several statements he made before trial regarding his impressions of the relationship between Mr. Velarde and Victim before the alleged assault, his observations of Mr. Velarde and Victim before the alleged assault, and various aspects of Mr. Velarde's account of the alleged assault, as shared by Mr. Velarde with Mr. Hinojosa. *Compare* (Doc. # 109 at 3–7) *with* (*id*. at 9–12).

**B.  VICTIM'S POST-TRAUMA MENTAL HEALTH CONDITION**

The Government's initial disclosures to Mr. Velarde and two supplemental productions included medical records pertaining to Dr. Jonathan Jackson's treatment of Victim from November 2018 to March 2019. The Government called Dr. Jackson to testify at trial about his treatment of Victim and the symptomatology of concussions and trauma.

Mr. Velarde states that on August 28, 2019, defense counsel first became aware of Victim's post-trauma mental health condition through an email from Dr. Jackson that defense counsel obtained in relation to sentencing. (Doc. # 109 at 12–13.) The email stated, in relevant part: "Those with mental health co-morbidities often have long recoveries [from concussions] (as would be the case here)"; "It would not be surprising if concussion symptoms were masked or less apparent by the immediacy of the trauma"; and "Co-morbidities: If a patient with one medical condition is also dealing with another medical condition, in this case: concussion injury and post-trauma." (*Id*. at 13.)

In his Reply, Mr. Velarde states that he learned on August 29, 2019, through a phone conversation between Dr. Jackson and defense counsel, that Victim had been formally diagnosed with Post-Traumatic Stress Disorder ("PTSD"). (Doc. # 122 at 12.)

## C. LILLIAN LANDIS'S POST-TRIAL STATEMENTS

Defense counsel interviewed Cadet Lillian Landis ("Ms. Landis"), Victim's roommate during the trial, on September 3, 2019. (Doc. # 118 at 2.) In that interview, Ms. Landis stated that Victim and Ms. Landis "did not know each other that well" before the alleged assault, but Victim talked to Ms. Landis about it approximately once a week after it took place. Ms. Landis told defense counsel she thought this was "a little bit weird" because she and Victim "were not super close." (*Id*. at 2.)

During the trial, Ms. Landis stayed in Victim's hotel room. Ms. Landis told defense counsel that Victim: followed the instant case on the internet, tracked who defense counsel interviewed, indicated she was disgusted by defense counsel's representation of Mr. Velarde, said she was going to keep the alleged assault "restricted" and later decided to make her report "unrestricted," gave Ms. Landis a

4

detailed account of the alleged assault, never cried in Ms. Landis's presence, and stated that she got a concussion by hitting her head on the bed. (*Id.* at 3.)

## II. LEGAL STANDARDS

"Rule 33 authorizes trial courts to grant new trials 'if the interest of justice so requires.'" *United States v. Herrera,* 481 F.3d 1266, 1269 (10th Cir. 2007) (relying on Fed. R. Crim. P. 33(a)). However, a motion for a new trial based on newly discovered evidence "is not favorably regarded and should be granted only with great caution," *United States v. Orr*, 692 F.3d 1079, 1099 (10th Cir. 2012); *United States v. Combs,* 267 F.3d 1167, 1176 (10th Cir. 2001), and "in exceptional cases where the evidence preponderates heavily against the verdict," *United States v. Evans*, 42 F.3d 586, 593–94 (10th Cir. 1994).

When a motion for a new trial is based on newly discovered evidence, the defendant is required to show that:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; **and** (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997) (quoting *United States v. Stevens*, 978 F.2d 565, 570 (10th Cir. 1992)) (emphasis added). The evidence is not newly discovered if the defendant was aware of the proposed testimony prior to trial. *United States v. Muldrow*, 19 F.3d 1332, 1339 (10th Cir. 1994).

"Implicit in a claim of newly discovered evidence is that there is new evidence— that is, material that is *admissible* at trial." *United States v. Hill*, 737 F.3d 683, 687 (10th Cir. 2013) (citing *United States v. Parker*, 903 F.2d 91, 102–03 (2d Cir. 1990) (requiring

that new evidence would probably produce an acquittal "presupposes, of course, that the proffered new 'evidence' would be admissible at the new trial.")) (collecting cases).

"In making the determination on whether to grant a new trial, the district court serves 'as a gatekeeper to a new trial, deciding in the first instance whether the defendant's proffered 'new evidence' is credible.'" *United States v. Shipp*, 277 F. App'x 840, 843 (10th Cir. 2008) (quoting *United States v. McCullough,* 457 F.3d 1150, 1167 (10th Cir. 2006) (affirming district court's denial of motion for new trial on basis that new evidence was not credible), *cert. denied,* 549 U.S. 1136 (2007)).

### III.  DISCUSSION

**A.  CARLOS HINOJOSA'S POST-TRIAL STATEMENTS**

1.  Recantation

Contrary to Mr. Velarde's argument, Mr. Hinojosa's testimony is not "recanted" for the purpose of a new trial. When a motion for new trial is based on recanted testimony, the trial court must first be satisfied that some **testimony at trial** was actually false. *See United States v. Bradshaw*, 787 F.2d 1385, 1391 (10th Cir. 1986). Because Mr. Hinojosa did not testify at Mr. Velarde's trial, there is no testimony for him to recant. The instant case does not implicate the issue of recanted testimony[1] because Mr. Hinojosa did not testify at trial and, therefore, the jury did not rely on Mr. Hinojosa's allegedly false pre-trial statements in reaching its verdict.

---

[1] The Court rejects Mr. Velarde's argument that "[w]hile case law Defendant cited involves witnesses who testified to a fact finder and subsequently recanted, there is no difference between a witness who did not testify at all and a witness who subsequently provides a different version of the facts after trial." *See* (Doc. # 122 at 1–2).

6

2. Newly Discovered Evidence

Further, any evidence that Mr. Velarde learned prior to trial is not newly discovered evidence within the meaning of Fed. R. Crim. P. 33. *See, e.g., United States v. Muldrow*, 19 F.3d 1332, 1339 (10th Cir. 1994) ("[T]he evidence is not newly discovered if the defendant was aware of the proposed testimony prior to trial."); *United States v. Quintanilla*, 193 F.3d 1139, 1147 (10th Cir. 1999) (concluding that proferred new evidence was not newly discovered and did not warrant a new trial because it was known to the defendant before trial); *United States v. Orr*, 692 F.3d at 1100 ("Because Orr later learned O'Riordan's testimony may have been more favorable than Orr anticipated does not make it newly discovered.").

Mr. Hinojosa was a potential witness who was in fact interviewed by Mr. Velarde's attorney, and Mr. Hinojosa was available to be called as a witness by Mr. Velarde at trial. None of the statements Mr. Hinojosa is now willing to make are new evidence.[2] Mr. Velarde cites no case law that supports the proposition that evidence previously available to him can be considered newly discovered evidence for the purpose of a motion for a new trial.

---

[2] These statements include: Mr. Hinojosa's impression that Mr. Velarde and Victim were more than just friends, Hinojosa's observation of "verbal flirting" between Mr. Velarde and Victim, Mr. Hinojosa's observation of Victim and Mr. Velarde cuddling, Mr. Hinojosa's observation of Victim and Mr. Velarde "laying on the floor with their heads close to one another" before rapidly pulling away from one another, Mr. Hinojosa's belief that he walked in on Victim and Mr. Velarde kissing, Mr. Hinojosa's recollection that Mr. Velarde said he and Victim kissed on two occasions, and Mr. Hinojosa's recollection that Mr. Velarde told him that the alleged assault started with kissing, that Victim was on top of Mr. Velarde, and that Victim pulled down her pants and her underwear. *See* (Doc. # 109 at 3–7).

### 3. Credibility

To the extent that Mr. Hinojosa's statements to defense counsel may constitute newly discovered evidence, that new evidence is not credible. "In making the determination on whether to grant a new trial, the district court serves 'as a gatekeeper to a new trial, deciding in the first instance whether the defendant's proffered 'new evidence' is credible.'" *United States v. Shipp*, 277 F. App'x at 843. By Mr. Velarde's count, Mr. Hinojosa said on at least three occasions that Mr. Velarde told him that Victim said "no" during the alleged sexual assault. All of these accounts were consistent, and one of these statements was made under oath to OSI. The fact that Mr. Hinojosa now seeks to provide a different story—following the conviction of his friend and his falling out with Victim—makes Mr. Hinojosa's new story not credible.

Mr. Velarde's contention that the Court may not consider Mr. Hinojosa's credibility in its evaluation of the instant motion is without support. Mr. Velarde quotes *USA v. Ramsey*, 726 F.2d 601, 605 (10th Cir. 1984), out of context for the proposition that Mr. Hinojosa's new statements "do not have to be reliable when determining whether testimony would probably produce an acquittal." (Doc. # 122 at 11.) Mr. Velarde suggests that "[t]he proper standard of whether recanted testimony would probably produce an acquittal is '[i]f a hurry [sic] heard and believed [the] new version of events at a new trial, the result would almost surely be an acquittal.'" (*Id*.) (citing *Ramsey*, 726 F.2d at 605). However, *Ramsey* goes on to say:

> But whether a new trial should be ordered in the instant case turns on the credibility of [the witness's] repudiation of his trial testimony. The evaluation of the credibility of witnesses is a matter for the trial court, not the appellate court. *United States v. Jackson,* 579 F.2d 553, 558 (10th Cir. 1978), *cert. denied,* 439 U.S. 981 [] (1978). If the court finds that the

8

> recantation is false, it need not order a new trial. *See United States v. Briola,* 465 F.2d 1018, 1022 (10th Cir. 1972), *cert. denied,* 409 U.S. 1108 [] (1973); *United States v. Steel,* 458 F.2d 1164, 1167 (10th Cir. 1972). We are mindful that recanted testimony is properly viewed with suspicion, *United States v. Ahern,* 612 F.2d 507, 509 (10th Cir. 1980), *cert. denied,* 449 U.S. 1093 [] (1981) . . . .

726 F.2d at 605. Further, the Tenth Circuit squarely rejected Mr. Velarde's argument in *United States v. McCullough*:

> [Defendant McCullough argues] that the district court was required to accept his proffered evidence as true, order a new trial, and allow a new jury to determine whether the proffered evidence was credible. Neither the case law from this circuit, nor for that matter the case law from any other circuit, supports such a position. To the contrary, our five-pronged test, which we outlined above, clearly implies that the district court is to serve as a gatekeeper to a new trial, deciding in the first instance whether the defendant's proffered "new evidence" is credible. *See also United States v. Gonzalez*, 933 F.2d 417, 447 (7th Cir. 1991) (holding that, in order to grant a new trial on the grounds that a material witness lied at trial, a district court must be satisfied that the witness's testimony was false). Moreover, the position asserted by McCullough is patently absurd, since it would allow a defendant to automatically obtain a new trial, and thereby undermine the time and resources devoted to the initial trial, simply by manufacturing some type of "newly discovered evidence," no matter how incredible such new evidence might be.

457 F.3d at 1167–68. Mr. Velarde's argument that the Court should not evaluate the credibility of this purportedly new evidence is without merit. The Court finds Mr. Hinojosa's new statements not credible.

### 4. Admissibility

Mr. Velarde also argues, without any citation to authority for this proposition, that "admissibility at trial is not the standard for new evidence." (Doc. # 122 at 4.) The clear weight of the case law establishes otherwise. *See, e.g., United States v. Hill*, 737 F.3d at 687 ("Implicit in a claim of newly discovered evidence is that there is new *evidence*—that is, material that is admissible at trial.") (citing *United States v. Parker*, 903 F.2d at

9

102–03 (requiring that new evidence would probably produce an acquittal "presupposes, of course, that the proffered new 'evidence' would be admissible at the new trial.")); *United States v. MacDonald,* 779 F.2d 962, 964 (4th Cir. 1985) ("To obtain a new trial on the basis of after discovered evidence, that evidence must be admissible in a new trial"); *United States v. Kamel,* 965 F.2d 484, 491 (7th Cir. 1992) (agreeing with *Parker); United States v. Dogskin,* 265 F.3d 682, 686 (8th Cir. 2001) (new testimony did not warrant a new trial because it was inadmissible); *Wolcher v. United States,* 233 F.2d 748, 749 (9th Cir. 1956) ("One important reason such alleged newly discovered evidence is insufficient ... is that such evidence would be inadmissible....").

The Court finds that Mr. Hinojosa's anticipated testimony would not be admissible at trial for a number of reasons—e.g., Mr. Hinojosa's testimony that Mr. Velarde told him that Victim did not say "no," but rather, said "this is incorrect" would be inadmissible hearsay pursuant to the Federal Rules of Evidence as a self-serving statement; Mr. Hinojosa's testimony that Victim hid the text message conversation between Ingram and Victim is both cumulative because Victim's disposal of that text conversation was discussed at trial and merely impeaching of Victim; Mr. Hinojosa's surprise and suspicion about that conduct on the part of Victim is not relevant; his belief of Mr. Velarde's innocence is not relevant and is an inadmissible opinion; his statement about Victim's motivations to file an unrestricted report is both cumulative because this subject was discussed at trial and merely impeaching of Victim; his opinion that it is odd that Victim told "so many people" about the alleged assault is an inadmissible opinion; Victim and Mr. Hinojosa's hug in Mr. Hinojosa's room is not relevant; Mr. Hinojosa's conjecture about Victim's mother's mental health or Victim's father's ability to "meet the

10

expectations of a father" are not relevant; and Victim and Mr. Hinojosa's falling out and Victim's alleged yelling at Mr. Hinojosa to "keep [her] name out of [his] mouth" are also not relevant. *See* (Doc. # 109 at 9–12).

The Court finds that, even if Mr. Hinojosa were permitted to testify at a new trial, it is unlikely that his testimony would produce an acquittal. *United States v. Sinclair*, 109 F.3d at 1531. Mr. Hinojosa was originally adamant both to defense counsel and to the OSI investigators that Mr. Velarde had told him that Victim told Mr. Velarde "no" three times. At trial, the Government will have much with which to impeach Mr. Hinojosa, including that he is now changing his story because he had a falling out with Victim. Furthermore, at trial, Mr. Velarde testified that Victim did not initially say "no," but rather said, "we shouldn't do this,"[3] and Cadet Hailie Burton testified that Mr. Velarde told her the following day that he stopped when Victim told him to stop. (Testimony of A. Velarde and H. Burton, Jury Trial Day Three.) Given the evidence presented at trial, whatever fragment of Mr. Hinojosa's testimony would be allowed at a new trial would not probably result in acquittal.

## B. VICTIM'S POST-TRAUMA MENTAL HEALTH CONDITION

With respect to the information related to Victim's mental health, the Court finds that Mr. Velarde could have discovered this evidence if he had exercised reasonable diligence. Furthermore, this evidence, even if new, would not probably lead to acquittal at a new trial. The Court addresses in turn Mr. Velarde's arguments related to Victim's post-trauma mental health symptoms and Victim's alleged PTSD diagnosis.

---

[3] *See* (Doc. # 117 at 33 and 48).

1. <u>Victim's Post-Trauma Mental Health Symptoms as New Evidence</u>

Evidence concerning Victim's post-trauma mental health symptoms is not new evidence. Mr. Velarde was repeatedly put on notice of Victim's post-trauma mental health symptoms, both before and during trial. For example, the following notes written by Dr. Jackson were disclosed to defense counsel on or before March 5, 2019, and put counsel on notice of Victim's post-trauma symptoms:

- "[I]n this case, assault and concussion injury have/will have overlapping symptomatology[.] [T]here are some concussion-specific components of symptoms . . . ." (INV_00000254);

- "concern re: emotional trauma of returning to AF [Air Force Academy]--will see patient in 24 h for re-eval" (INV_00000254);

- "will consider rx/formal sleep hygiene counseling for sleep if persists disrupted" (INV_00000254);

- "sleep: - still fragmented . . . mult early awakenings- not sure if flashbacks" (INV_00000249);

- "mood: has had big swings 'really bad then totally fine'--both anger, anxiousness, feeling blue[,] overall better, much less anxiousness" (INV_00000233);

- "mood: doing better overall- still some lability" (INV_00000515);

- "mood: still some lability" (INV_00000510);

- "mood: still some lability[,] periods of blue mood, periods of anxiety" (INV_00000503);

- "re: MH [mental health]/counseling, did encourage her to make appt with chaplain- given some nightmare/flashback, I rec she have formal counseling (she has been hesitant to do so) (INV_00000505);

- "she has multiple acute stressors today: mother's visit, some frustrations with gossip from peers . . . . agrees to see counselor—squadron coach is going to assist her with contacting either PPC or MLFC" (INV_00000511);

- "still some nightmare/flashback" (INV_00000500);

- "mood: still some lability[,] periods of blue mood, periods of anxiety . . . pending visit with chaplain- hasn't done any counseling yet[,] past hx [history]: has seen ppc for anxiety (due to challenges with family custody issue back home)" (INV_00000500);

- "periods of blue mood (most days, 1 hr), less anxiety[,] had 3 episodes of panic over break, non since back at AFA . . . . hesitant to have any formal counseling or prescription" (INV_00000471);

- "- 14 Jan: . . . still some post-trauma sx [symptoms]" (INV_00000471);

- "mood: continues to do better[,] still with episodes of tearfulness but less blue mood, anxiety- rare interference with ADLs [activities of daily living][,] no panic episodes since 13 Jan (based on legal/situational proceedings with assault)" (INV_00000463);

- "has intermittent episodes of panic/emotional lability" (INV_00000497).

Further, at trial, the Government raised Victim's mental health in its case in chief to support its theory of the case. Dr. Jackson testified about when symptoms of trauma and concussions can overlap in general and whether, in the instant case, Victim's symptoms stemmed exclusively from her concussion. He testified:

> Q. Can serious trauma cause symptoms that are akin to a concussion?
>
> A. Yes.
>
> Q. How is that?
>
> A. So, those symptoms are fairly common in concussion injury, but if someone has an emotional or physical assault, they certainly may have sleep disruption or emotional symptoms. So those could be overlapping symptoms between a concussion injury and an assault injury.
>
> Q. So how do you sort out, then, symptoms that are concussion related versus related to another assault or traumatic event?

13

> A. We try and look at symptoms that would be more specific for a concussion. For example, a balance disturbance would rarely be caused by an emotional or physical trauma.
>
> * * *
>
> Q. Were her symptoms exclusive to a concussion versus a different reason?
>
> A. I felt some of her symptoms were. She, as I said, was tearful and distraught. And I feel emotional symptoms, even her cognitive symptoms, may be related to an assault. The balance and light sensitivity, to me, seemed very specific for a concussion injury, though. Those wouldn't typically happen from emotional trauma or even from physical assault.

(Doc. # 116 at 12, 20.)

Thus, evidence concerning Victim's post-trauma mental health condition cannot be considered newly discovered evidence. To the extent that the evidence is new to Mr. Velarde, the Court finds that defense counsel's failure to discover evidence related to Victim's post-trauma mental health condition was caused by his own lack of diligence. Mr. Velarde could have reasonably anticipated the relevance of Victim's mental health to his defense, could have sought to question Dr. Jackson before trial and during trial, and could have retained his own expert to testify to these issues.

2. <u>Victim's Alleged PTSD Diagnosis as New Evidence</u>

Mr. Velarde argues for the first time in his Reply that he learned from a post-trial phone call between defense counsel and Dr. Jackson that Victim has been formally diagnosed with PTSD. (Doc. # 122 at 11–12.) To the extent this alleged diagnosis was not discovered by Defendant until this post-trial phone call, the Court again finds that such failure to discover this information was caused by a lack of diligence on the part of counsel. Given the above pretrial disclosures and Dr. Jackson's testimony at trial,

14

defense counsel could have sought evidence related to Victim's mental health condition before trial or through cross-examination at trial. The fact that defense counsel discovered this evidence after one phone call with Dr. Jackson underscores the minimal amount of diligence that would have been required to discover this evidence before trial. Further, defense counsel's uncorroborated speculation that Victim's PTSD could have predated the alleged assault is not new evidence.

Ultimately, Victim's diagnosis would not probably result in an acquittal at a new trial. The Government explored Victim's post-trauma symptoms in its case in chief, and the jury convicted Mr. Velarde on all counts. Victim's PTSD diagnosis would not be helpful to Mr. Velarde. As such, it is not proper grounds for a new trial.

## C.     LILLIAN LANDIS'S STATEMENTS

The Court finds that Ms. Landis's post-trial statements do not satisfy the requirements of a motion for a new trial because they would be inadmissible at trial, they are not credible, and they are unlikely to produce an acquittal if a new trial were granted.

As with Mr. Hinojosa's statements, many of Ms. Landis's statements would not be admissible at trial. For example, Ms. Landis's statements regarding Victim's behaviors during trial—e.g., that she did not cry, that she followed her case on the internet, and that she was disgusted by defense counsel for representing Mr. Velarde (Doc. # 118 at 2)—are not relevant to the charges in the instant case, other than to impeach Victim's credibility. Even if relevant, Ms. Landis lacks the qualifications that would be required to opine on common manifestations of trauma in victims of sexual assault and whether Victim's behaviors were consistent with such manifestations of

trauma. *Cf., e.g., United States v. Martinez*, 6 F. App'x 750, 753–54 (10th Cir. 2001) (affirming district court's admission of expert testimony that the victim's behavior was consistent with that of other victims of childhood trauma where the witness was a licensed mental health counselor with a clinical master's degree, doctorate degree in clinical psychology, and clinical experience with victims of childhood trauma); *United States v. Henry*, No. CR 16-1097 JH, 2018 WL 794499, at *5 (D.N.M. Feb. 8, 2018) (allowing expert testimony on common behaviors of victims of sex trafficking and long term effects of being trafficked where witness had a doctorate degree in psychology and counseling and research experience in the field of trauma and the psychology and dynamics of sex trafficking) (citing *United States v. Chapman*, 839 F.3d 1232, 1234, 1236-40 (10th Cir. 2016)).

Ms. Landis's only statement that could arguably go to material issues involved in this case is her statement that Victim told Ms. Landis she suffered a concussion because she hit her head on the bed. However, this statement is inadmissible on at least two grounds. It is cumulative—the issue of Victim's changing account of how she hit her head was explored at trial through both Victim and Dr. Jackson—and it merely impeaches Victim as a prior inconsistent statement.

Lastly, the Court agrees with the Government's contention that, even if Ms. Landis were permitted to testify as to all statements Mr. Velarde proffers, the new evidence is unlikely to produce an acquittal at a new trial. Ms. Landis does not add any new, relevant, and reliable information to the instant case.

### IV.  CONCLUSION

Because Mr. Velarde has not made the necessary showing for a new trial based

16

on newly discovered evidence on any of his three proposed grounds for a new trial, it is ORDERED that Defendant's Motion for a New Trial (Doc. # 109) is DENIED. It is

FURTHER ORDERED that counsel are to confer with one another and jointly contact chambers at Arguello_Chambers@cod.uscourts.gov to reset Mr. Velarde's Sentencing Hearing.

DATED: February 14, 2020

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge